**BRADFORD SCHOOL BUS TRANSIT, INC., et al., Plaintiffs-Appellants,**

v.

**CHICAGO TRANSIT AUTHORITY et al., Defendants-Appellees.**

No. 75–1958.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1976.

Decided July 7, 1976.

Rehearing Denied Aug. 9, 1976.

---

James J. Flynn, Chicago, Ill., for plaintiffs-appellants.

Samuel K. Skinner, U. S. Atty., Chicago, Ill., Joseph A. Blundon, Asst. Chief Counsel, Urban Mass Transportation, Washington, D. C., Norman J. Barry, Chicago, Ill., for defendants-appellees.

Before HASTINGS, Senior Circuit Judge, SPRECHER and TONE, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal concerns a class action for declaratory and injunctive relief brought by Bradford School Bus Transit Incorporated ("Bradford") and the Illinois School Transportation Association ("ISTA"), against the Chicago Transit Authority ("CTA"), the Urban Mass Transportation Administration ("UMTA") and Judith T. Connor, Administrator of the Urban Mass Transportation Administration. The questions presented here are whether private school bus operators have standing to challenge the actions of the Urban Mass Transportation Administration and if so, whether those actions are judicially reviewable.

I

In June 1974, in accordance with the terms of the Urban Mass Transportation Act ("Act"), 49 U.S.C. § 1601 *et seq.*, UMTA entered into a grant contract with the CTA to provide financial assistance for purchasing passenger buses, rapid transit cars and related equipment, Project No. IL–03–0040. Pursuant to Sections 1602(g) and 1602a(b) of the Act, the grant contract included a provision which under certain conditions specifically prohibited the CTA from engaging in school bus operations in competition with private bus operators.[1] UMTA later agreed to provide additional financial as-

---

1. The Urban Mass Transportation Act of 1964 *as amended*, 49 U.S.C. § 1602(g) reads as follows:

   (g) *No Federal financial assistance shall be provided under this chapter for the construction or operation of facilities and equipment for use in providing public mass transporta-* *tion service to any applicant for such assistance unless such applicant and the Secretary shall have first entered into an agreement that such applicant will not engage in schoolbus operations, exclusively for the transportation of students and school personnel, in competition with private schoolbus opera-*

sistance to the CTA and the project was expanded to include the acquisition and construction of additional capital items.

Shortly thereafter, in December 1974, the Chicago Board of Education solicited bids from various bus companies for the transportation of students attending the Chicago Public Schools. Plaintiff Bradford and defendant CTA submitted bids to provide those services. The CTA's bid was accepted and it has been providing bus transportation for Chicago school children since January 1975.

Plaintiffs then brought this suit individually and on behalf of all private school bus operators in CTA's service area seeking a declaration that the CTA is engaged in school bus operations in violation of. the Act and of the grant contract. They also sought to enjoin UMTA from providing further financial assistance to the CTA. The district court, granting a defense motion, dismissed plaintiffs' complaint for lack of standing and concluded that UTMA's action was not subject to judicial review. Plaintiffs now appeal from that order.

## II

■ We shall first consider the issue of plaintiffs' standing. In dismissing the plaintiffs' complaint for lack of standing, the district court relied solely upon *South Suburban Safeway Lines, Inc. v. City of Chicago,* 416 F.2d 535 (7th Cir. 1969). In *South Suburban,* a private bus company sought to challenge a grant to the CTA for a proposed extension of its rail operations which had been authorized by UMTA. Section 1602(c) of the Act, (now § 1602(e)) prohibited UMTA from providing financial assistance to a public transit corporation for the purpose of acquiring or operating in competition with a private transit corporation, unless, among other things, the Secretary of Transportation found this operation to be essential to a coordinated urban transportation system. In that case we held that the company lacked standing to complain. In our view, the district court's reliance on *South Suburban* was misplaced.

The Administrative Procedure Act grants standing to persons "suffering legal wrong because of agency action, or adversely af-

tors. This subsection shall not apply to an applicant with respect to operation of a schoolbus program if the applicant operates a school system in the area to be served and operates a separate and exclusive schoolbus program for this school system. This subsection shall not apply unless private schoolbus operators are able to provide adequate transportation, at reasonable rates, and in conformance with applicable safety standards; and this subsection shall not apply with respect to any State or local public body or agency thereof if it (or a direct predecessor in interest from which it acquired the function of so transporting schoolchildren and personnel along with facilities to be used therefor) was so engaged in schoolbus operations any time during the twelve-month period immediately prior to November 26, 1974. A violation of an agreement under this subsection shall bar such applicant from receiving any other Federal financial assistance under this chapter. (Emphasis added.)

The Federal-Aid Highway Act of 1973, 49 U.S.C. § 1602a(b), a virtually identical provision, provides:

(b) No Federal financial assistance shall be provided under (1) subsection (a) or (c) of section 142, Title 23, (2) paragraph (4) of subsection (e) or section 103, Title 23, or (3) this chapter, for the purchase of buses to any applicant for such assistance unless such applicant and the Secretary of Transportation shall have first entered into an agreement that such applicant will not engage in school bus operations, exclusively for the transportation of students and school personnel, in competition with private school bus operators. This subsection shall not apply to an applicant with respect to operation of a school bus program if the applicant operates a school system in the area to be served and operates a separate and exclusive school bus program for this school system. This subsection shall not apply unless private school bus operators are able to provide adequate transportation, at reasonable rates, and in conformance with applicable safety standards, and this subsection shall not apply with respect to any State or local public body or agency thereof if it (or a direct predecessor in interest from which it acquired the function of so transporting school children and personnel along with facilities to be used therefor) was so engaged in school bus operations any time during the twelve-month period immediately prior to August 13, 1973. A violation of an agreement under this subsection shall bar such applicant from receiving any other Federal financial assistance under those provisions of law referred to in clauses (1), (2), and (3) of this subsection.

fected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The Supreme Court has reviewed the question of standing to challenge agency action with respect to this provision. In *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), which involved a section of the TVA Act designed primarily to protect against TVA competition, the Court held that the plaintiff, Kentucky Utilities Co., had standing to sue and stated:

> [I]t has been the rule, at least since the *Chicago Junction Case,* 264 U.S. 258 [44 S.Ct. 317, 68 L.Ed. 667] (1924), that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision. *See Alton R. Co. v. United States,* 315 U.S. 15, 19 [62 S.Ct. 432, 435, 86 L.Ed. 586] (1942); *City of Chicago v. Atchison, T. & S. F. R. Co.,* 357 U.S. 77, 83 [78 S.Ct. 1063, 1066, 2 L.Ed.2d 1174] (1958).

*Id.,* at 6, 88 S.Ct. at 654. And, as Justice Douglas observed in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970):

> Where statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action. The whole drive for enlarging the category of aggrieved "persons" is symptomatic of that trend.

In *Data Processing,* which held that an association of data processors had standing as competitors to challenge a regulation of the Federal Comptroller which permitted national banks to provide data processing services, the Court announced a two-prong test for standing:

> . . . whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise . . . [and] whether the interest

sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Id.,* at 152–153, 90 S.Ct. at 829.[2]

We are convinced that the test employed by the Supreme Court in *Data Processing* is controlling in the instant case. First, plaintiffs here have a personal stake and interest in the litigation which amounts to an injury in fact under 5 U.S.C. § 702. Plaintiffs have alleged that they have been adversely affected by the CTA's operation of school bus services. Specifically, plaintiff Bradford has alleged that the CTA, an illegal competitor, was awarded a contract to provide school bus services for which Bradford had bid. Secondly, plaintiffs as private bus operators clearly fall within the zone of interests to be protected by the statute. In fact, plaintiffs represent the only parties to be protected by the statutory provisions. As defendant UMTA concedes in its brief, the purpose of sections 1602(g) and 1602a(b) is to protect private school bus companies from competition by federally funded public transit systems. That intent is clearly reflected in the language of both sections 1602(g) and 1602a(b) which provide in pertinent part that:

> [Unless certain exceptions apply] [n]o Federal financial assistance shall be provided . . . to any applicant . . . unless such applicant . . . [agrees] not [to] engage in school bus operations, exclusively for the transportation of students and school personnel, in competition with private school bus operators. . . . A violation of an agreement under this subsection shall bar such applicant from receiving any other Federal financial assistance under this chapter.

Therefore, we conclude that plaintiffs have satisfied the two-prong test enunciated in *Data Processing* and thus have standing to bring this action.

---

**2.** *Accord, Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Apter v. Richardson,* 510 F.2d 351 (7th Cir. 1975); *Cotovsky-Kaplan Physical Therapy Associates, Ltd. v. United States,* 507 F.2d 1363 (7th Cir. 1975).

## III

■ Having determined that plaintiffs have standing, we now turn to the issue of whether UMTA's actions are judicially reviewable. The district court, in dismissing plaintiffs' complaint considered this question and concluded:

By legislating that the U.M.T.A. and assistance applicants enter into an agreement as to non-competition with private school bus operators, the Congress clearly committed the decision as to whether a breach has occurred and whether or not to act on that breach to the agency's discretion. By this device, Congress clearly precluded judicial review.

Defendants urge us to follow the reasoning of the district court.

In order to determine whether judicial review of UMTA's action is required, we must analyze Section 701(a) of the Administrative Procedure Act and the relevant case law. Section 701(a) reads:

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

In the instant case, the statutory provisions do not expressly preclude judicial review. Consequently, we must closely examine the statutory scheme and consider whether judicial review is precluded by inference. Justice Douglas' remarks in *Barlow v. Collins*, 397 U.S. 159, 166–167, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970) are most helpful:

As we said in *Data Processing Service*, preclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred. *See Leedom v. Kyne*, 358 U.S. 184 [79 S.Ct. 180, 3 L.Ed.2d 210]; *Harmon v. Brucker*, 355 U.S. 579 [78 S.Ct. 433, 2 L.Ed.2d 503]; *Stark v. Wickard*, 321 U.S. 288 [64 S.Ct. 559, 88 L.Ed. 733]; *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 [23 S.Ct. 33, 47 L.Ed. 90]. Indeed, judicial review of such administrative action is the rule, and nonreviewability an

exception which must be demonstrated. In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 [87 S.Ct. 1507, 1511, 18 L.Ed.2d 681], we held that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." A clear command of the statute will preclude review; and such a command of the statute may be inferred from its purpose. *Switchmen's Union v. National Mediation Board*, 320 U.S. 297 [64 S.Ct. 95, 88 L.Ed. 61]. It is, however, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent" that the courts should restrict access to judicial review. *Abbott Laboratories v. Gardner, supra*, at 141 [87 S.Ct. 1507 at 1511]. The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review the statutory objectives might not be realized. See the *Chicago Junction Case*, 264 U.S. 258 [44 S.Ct. 317, 68 L.Ed. 667]; *Hardin v. Kentucky Utilities, supra*.

And as this court pointed out in *Cotovsky-Kaplan Physical Therapy Associates, Ltd. v. United States*, 507 F.2d 1363, 1368 (7th Cir. 1975) ". . . the stringent standards set forth in *Data Processing* [must be met] before a Congressional intent to preclude judicial review . . . can be found." In the instant case, as we have indicated, plaintiffs are clearly members of the class of persons which Congress intended to protect and it follows that their interests should be safeguarded in the courts. Furthermore, there is no clear and convincing evidence of a Congressional intent to foreclose review.

Nor are we convinced that the statutes commit UMTA's action solely to its discretion by law. The mere inclusion of a contract mechanism and UMTA's discretion with respect to breaches is insufficient to preclude review. In *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d

920, 934 (2d Cir. 1968) which involved plaintiffs who sought to assert rights guaranteed them under certain housing acts subject to grant contracts between HUD and the Redevelopment Agency, the court stated:

> It has been suggested to us that since section 105(c) only provides that the relocation requirements be included in loan or capital grant contracts, the requirements are merely contract rights possessed by the federal government, which cannot be enforced by displacees. This is a proposition we cannot accept, for much more is involved here than a narrow issue of contract rights. As we have already said, the fact that Congress intended to protect the specific interests of displacees when it enacted the section is enough to give the displacees standing, in the absence of a persuasive reason to believe that Congress intended to cut off judicial review. . . . That Congress provided for enforcement of the relocation provisions through contracts with the local agencies does not weaken the appropriateness of judicial review, for such a method of enforcement is natural where Congress is specifying what requirements local agencies must meet in order to receive federal aid. The possibility that an administrative agency, charged with enforcing a requirement established by Congress in the public interest, will not adequately perform the task is equally great whether enforcement is through contract or through direct regulation. Accordingly, the reasons for allowing those who have a direct, personal interest in furthering the Congressional purpose to seek judicial review of administrative action are as compelling in one situation as in the other.

Finally, we believe it is significant that the rules and regulations issued by the Urban Mass Transportation Administrator on March 29, 1976 specifically provide for judicial review of administrative actions regarding school bus operations after certain procedures have been exhausted. Fed. Register, Vol. 41, No. 64, 49 C.F.R. §§ 605.-30–35 (April 1, 1976).

## IV

■ Although we are convinced that Congress did not intend to preclude judicial review of UMTA's actions, we refrain from further review of plaintiffs' claim and defer to the primary jurisdiction of UMTA. UMTA has recently established complaint procedures and remedies available to interested parties "alleging a violation or violations of terms of an agreement" entered into "pursuant to" an UMTA grant.[3] We

---

**3.** The rules and regulations governing school bus agreements were issued March 29, 1976, approximately one year after plaintiffs filed suit. Subpart D which provides for complaint procedures and remedies states as follows:

§ 605.30: Any interested party may file a complaint with the Administrator alleging a violation or violations of terms of an agreement entered into pursuant to § 605.14. A complaint must be in writing; must specify in detail the action claimed to violate the agreement, and must be accompanied by evidence sufficient to enable the Administrator to make a preliminary determination as to whether probable cause exists to believe that a violation of the agreement has taken place.

§ 605.31: On receipt of any complaint under § 605.30, or on his own motion if at any time he shall have reason to believe that a violation may have occurred, the Administrator will provide written notification to the grantee concerned (hereinafter called "the respondent") that a violation has probably occurred. The Administrator will inform the respondent of the conduct which constitutes a probable violation of the agreement.

§ 605.32: The Administrator will allow the respondent not more than 30 days to show cause, by submission of evidence, why no violation should be deemed to have occurred. A like period shall be allowed to the complainant, if any, during which he may submit evidence to rebut the evidence offered by the respondent. The Administrator may undertake such further investigation, including, in his discretion, the holding of an evidentiary hearing or hearings.

§ 605.33: (a) After reviewing the results of such investigation, including hearing transcripts, if any, and all evidence submitted by the parties, the Administrator will make a written determination as to whether the respondent has engaged in school bus operations in violation of the terms of the agreement.

(b) If the Administrator determines that there has been a violation of the agreement,

are mindful that these procedures were not in effect at the time plaintiffs' complaint was filed. Nonetheless, we think that UMTA's actions cannot be reviewed until plaintiffs exhaust these administrative remedies.

■ The doctrine of primary jurisdiction is concerned with promoting proper relationships between courts and administrative agencies. It applies where a claim is originally cognizable in the courts whenever enforcement of that claim requires resolution of issues, which under a regulatory scheme, have been placed within the special competence of an administrative body. "In such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Eisman v. Pan American World Airlines*, 336 F.Supp. 543, 547 (E.D.Pa.1971). The Supreme Court defined primary jurisdiction in *Far East Conference v. United States*, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952):

> [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by spe-

cialization, by insight gained through experience, and by more flexible procedure. *Accord, Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 654, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). There is no fixed formula for the invocation of the doctrine of primary jurisdiction and "the decision whether to apply it depends upon a case by case determination of whether, in view of the purposes of the statute involved and the relevance of administrative expertise to the issue at hand, a court ought to defer initially to the administrative agency." *Feliciano v. Romney*, 363 F.Supp. 656, 674 (S.D.N.Y. 1973). The policy factors underlying application of the doctrine are: "(1) the desirable uniformity which would obtain if a specialized agency initially passed on certain types of administrative questions, . . . and (2) the expert and specialized knowledge of the agencies involved." *Eisman v. Pan American World Airlines, supra*, 336 F.Supp. at 547.

After careful consideration of the facts presented by the instant case, we have concluded that the doctrine of primary jurisdiction is applicable. Thus, plaintiffs must exhaust their administrative remedies before a court can review their claim.

The judgment entered below is affirmed.

Affirmed.

he will order such remedial measures as he may deem appropriate.

　(c) The determination by the Administrator will include an analysis and explanation of his findings.

§ 605.34: If the Administrator determines, pursuant to this subpart, that there has been a violation of the terms of the agreement, he may bar a grantee or operator from the receipt of further financial assistance for mass transportation facilities and equipment.

§ 605.35: The determination of the Administrator pursuant to this subpart shall be final and conclusive on all parties, but shall be subject to judicial review pursuant to Title 5 U.S.C. §§ 701–706.

Fed.Register, Vol. 41, No. 64, 49 C.F.R. §§ 605.-30–35 (April 1, 1976).